For those of you who weren't present earlier this morning, we do have a third justice assigned to this panel, Justice Moore. I know that a few days ago he wasn't feeling very well, but I'm sure he's feeling really great this morning because he's been elected as our new appellate court justice. But at any rate, he couldn't be here today. That does not mean that he will not give your case due consideration because, as you probably all know, everything that's said in the courtroom is recorded. And it's available for public listening as well as available for a justice who's assigned to the case to listen to as well. So nothing that you say here will be missed by Justice Moore, and I'm sure that he will give your case the same due consideration that Justice Chapman and I are going to give you. So with that, let's take the case of 5-15-0464. I guess it's Carmen KS-4 v. Joey Allen. Did I pronounce that correct? Okay. Mr. Cruz and Mr. Thromkel, you may proceed. Thank you, Your Honor. This chair is with me. I'm sorry. We approve the court. Counsel. Your Honor, this case is about a partnership agreement between Carmen KS-4 and my client Joey Allen, an individual. And Carmen KS-4, just by the term itself, is somewhat confusing and leads to some questioning. But what it is is it's a partnership agreement between six individuals and my client Joey Allen. And Joey Allen came into the partnership basically as the new partnership, KS-4, and KS-4 Kansas. But the company, Carmatic, is based out of Roxanna, Illinois, and it's owned by Dan Binkley. And Dan Binkley is at the top. He's the one that started the company and he created this company as a partnership, a multi-level partnership, where there's downstream partners and the upstream partners get a cut of revenues generated by the downstream partners. So Joey Allen is at the bottom level and Dan Binkley is at the top. Dan Binkley, being the business owner of a large business and a complicated partnership, very knowledgeable about business matters and legal matters, and Joey Allen is an uneducated, unsophisticated person. When you say uneducated, do you mean he's had no schooling after high school? Correct. Okay. And he came into the partnership by way of his stepsister's brother-in-law, who brought him into the partnership. But he was a partner at the time the dispute arose, right? That's correct. And he signed a partnership agreement on March 10th, 2007? Is that the agreement we're here about today? I believe it was March 10th. Okay. That's all right. It's not important at this point. I would like to get more to the issues before the court, as opposed to all the history of who's related to who, if you don't mind. All right, Your Honor. There was no prior material breach by Joey Allen. The prior material breach was, in fact, by Dan Binkley and the car medic. The multilevel marketing and multilevel partnership was comprised of territories, and Joey Allen was given a certain territory in which he was allowed to work. And he worked under his upline partner, Mike Athon. And the whole dispute arose because Mike Athon was asking Joey Allen to work outside of his assigned partnership area, but it was within Mike Athon's area. And Mike Athon asked him to do it, so Joey Allen had permission to do it, and he did it a few times until it came to the attention of Dan Binkley. And then Dan Binkley found out that some other of the downline partners were doing that, too, so they held a meeting. And at that meeting, Joey Allen testified that Dan Binkley told them that he was going to set a fine of $20,000 against all the individuals who had violated the partnership agreement in the territorial area. Was that liquidated damages in the agreement? No, that was just a round of $20,000. That's what I'm going to actually refer to it later as a way to keep the partners in line. He referred to it as a way to spank the partners. That sounds like a penalty. Was there anything in the partnership agreement that allowed that? There was nothing in the partnership agreement about a $20,000 fine for violating the territory area. Do you agree that Missouri law is the law to be applied in this case? Yes, Your Honor, I do agree. Is there any issue on that that you're aware of from Carmen KS-4? I don't believe there's a dispute as to that. Okay, so Missouri law is going to apply. Missouri law applies. An example of how Mr. Binkley is a sophisticated businessman, he has numerous, numerous partnership agreements with numerous individuals. Do they apply to this case? No. Okay, then let's talk about this. In this case, they've applied Missouri law for Carmen, an Illinois company, for KS-4, which is a Kansas partnership. And one must ask the question, why is he using Missouri law? Well, because Dan Binkley is a sophisticated businessman. He has lawyers. He's had many lawsuits, and he knows that Missouri law is the most beneficial for his partnership. My client had no knowledge whatsoever regarding application of law to a contract, much less any of the other terms regarding the liquidated damages clause or the non-compete or non-solicit. The injunction in this case we believe is invalid for several reasons. First of all, there was absolutely no evidence of a breach or violation by Joey Allen of the non-compete provisions of the agreement. Carmen put on some evidence of invoices that did not show anything about what those invoices were for. Painless dent removal services are what is covered by the agreement. But the invoices did not state what they were for. There was no testimony that they were for painless dent removal, and there was no proof. And there was only one copy. That's the only proof they had. So there's no evidence of any violation of the non-compete. The injunction we believe also is invalid because the two years of the non-compete period run from the date of termination. And that is a law in Missouri. And even if there was a violation or anything, the termination date would determine when the two years begins to fit. Is termination under Missouri law the same as withdrawal from a partnership? Yes, Your Honor. Yes? Yes. And under the agreement itself, and in paragraph 4.9, it describes the event of withdrawal as a breach of the agreement or a cessation by any partner of providing services under the agreement. And I don't think there's any dispute that Joey Allen ceased providing services under the agreement on April 10, 2010. That was at the meeting they had about the $20,000 fine, which we submitted. The $20,000 fine was a breach by Carmett or Dan Binkley to assess such an unreasonable fine for a violation he claimed on the territory that he did with his upline partner's approval. And there was no evidence or allegations that that even caused any damages to Carmett. Because the money was reported. Everyone got their share. There's no damages to Carmett for the original alleged violation of the territory area. And at the meeting when they imposed the $20,000 fine, my client quit, but we submitted that was a constructive discharge. Because who's going to work under a company where you're getting charged $20,000 for a simple, you know, alleged dispute that didn't damage anyone? And Dan Binkley himself says in his testimony that that was a spank. The fine that he was going to impose was a spank to keep the guys in line. That's a penalty. That is not anything related to actual damages. Your Honor, I'm sorry, I forgot to ask how much time I have. At the beginning. Okay, thank you. Then you're given some rebuttal time. All right. Where are you from, sir? I'm from St. Louis. Okay. We welcome. And I've been here one other time. Welcome to Southern Illinois. But go ahead. I've enjoyed it. The case was originally filed in February of 2012, almost two years after my client stopped employment or working in the partnership. Then he quit in April of 2010. It was filed almost two years later, and the judgment was not rendered until 2015, October 1, 2015, more than five and a half years later. Well, my notes indicate that on September 21, 2015, the court denied the defendant's motion for summary judgment. Right. And then there was a motion for continuance due to a medical procedure. Yes. Was that you? That was me. Okay. And that request was disallowed? That request was denied. Denied. And how many days, you were seven days before trial when that request was denied? I believe so. It was very close in time. The first day was unsuccessful, so I went back a second day, and I had to redo the surgery on a hip replacement. I saw that. So it looked like the 28th of September was the hearing date. So what did you do about counsel? So I actually had a co-counsel that was really just local counsel because I'm in Richmond Heights, and I had the local counsel, John O'Hara, appear just for one or two hearings. And he's not really a civil lawyer. He's a criminal lawyer. No, he's not. And I think the judge, I'm sure, is well aware of that. And I specialize in defending non-compete agreements, so I was absolutely the lead counsel. And had you been lead counsel the entire time? Yes. Did you show up in Madison County for all of the significant hearing dates as opposed to, say, a motion to continue or a status conference? Yes. Had you been there? Yes. Okay. So Mr. O'Gara was put in play to defend. And he attempted to withdraw, and that was denied. Oh, yeah, I did see that, too. I do have a question, though. The trial was scheduled for September 28th. If you had surgery on the 22nd, you thought you were going to be able to proceed to trial five, six days later? Yes. My physician originally told me that I should be able to get up and around. From a hip replacement? It's like a partial hip replacement. It's not a full hip replacement. And then I had to have surgery the second day. They opened me back up and went back in and took out the prosthesis and put a different one on. So you would have been released to return to work in six days originally? I plan not to. Okay. So Mr. O'Gara was not allowed to withdraw, and did he proceed with the trial then? He did. Okay. He did the best he could, and I think he did okay under the circumstances. Okay. And then on October 1, Judge Metozian entered a 24-month injunction and 224,000 liquidated damages. Yes. And now I have a question about these damages. It says that these were agreed upon. Did you ever agree that the liquidated damages would amount to $224,000? Absolutely not. Okay. So that portion of the order is incorrect. I think what he's saying, I can't say for sure, but I think what he's saying is that there was a clause for the liquidated damages. Speak up, please. I believe he was saying that there was a clause for liquidated damages. So it looks like if there's a form selection clause that, you know, there was an agreed upon thing, I think he's saying that the liquidated damages were agreed on per the contract. And they were, weren't they? They were in the contract, yes. Right, but it was not 224,000. No, it was a formula. Huh? It was a formula. Right. Okay. I understand, but that's what I'm asking is, at one point during the discussions, did you agree with Judge Matossian that if the liquidated damages clause were to apply, then the amount would be, under the formula, 224? No. You never agreed with that? No, I never agreed to that. Okay. And the liquidated damages clause is paragraph 6.4E, and the paragraph itself is 17 lines long in the contract. And my client, being, you know, a young, unsophisticated guy with a low level of education, he had no idea what this clause meant. And it doesn't – He didn't have an attorney review this before signing it? No. And, you know, it amounts to two years of net income for the partnership. So no matter what the violation was, if he violated it one time with one customer, did it one again, he would be charged two years of net income. That's in no way related to the violation whatsoever. And it's two full years of all the revenue you make that you can find. And that is so unreasonable, oppressive, it's unconscionable and shouldn't be enforced anymore. You know, the law says that it's got to be reasonably related to actual damages. Well, they really have no testimony at all on actual damages. And the alleged violations that they said did occur, the Westlaw, O'Donnell Motors, again, they never had any evidence. That was Pantless Net Renewal Services for, you know, how long it continued. And the agreement itself says that if you do not compete, starts to run from the date of termination or can be extended if there's a continuing violation. Well, they had no evidence that there was a continuing violation at all after those invoices that Westlaw had done. So if you use those and say they are a violation, you would start the clock running two years from then, which was 2012. That would have expired in 2014. And your argument then is based on those invoices? Yes. Okay. That's their only proof that they had. And even then, it wasn't proof that those were violations. Well, was there any evidence that showed your client was engaged in the business of dent repair up through the day of the trial? Did anything like that come forward? Only these invoices that he had performed the work. I believe he testified he was in business, but I don't think there's any evidence of what he was doing or how long it lasted. Okay. And the court assessed an injunction, injunction relief, and liquidated damages. So in essence, it's double-dipping. The plaintiff is double-dipping. They're getting him to shut down his employment for two years, and they're getting damages worth two years of full revenue. So you would have to pick one or the other, and I believe the case is Property Tax Representative v. Chatham. And you can't have your case be a two. You've got to choose, elect your remedy. And the remedy is either going to be the equitable remedy of an injunction or legal remedy of damages. And they end up getting both. So I think that is also reason why the injunction is invalid and the damages that were assessed are invalid because they're excessive and not reasonably related to the actual damages, which is required by law. When Mr. Allen was taken into the partnership, as you said, he was uneducated and had no experience in this. And one of the partners, I think John Davidson, correct me if I'm wrong, gave up a number of clients so that Mr. Allen would have his own territory. Is that true? I mean, so the partnership, per se, did give him some consideration, whether it was substantial or not, I don't know. But it seems like they gave him a territory. They did. They gave him a territory. And I'm sure that he got a few partners, I mean, a few customers that were worked on by an upline partner. I'm not sure who it would have been. Is there anything about dent repair or the process that was being used by this partnership that's a trade secret or somehow isn't known? No, Your Honor. Paintless dent removal is a method of removing dents from the car where they basically pry out the door panel from the window or get access to underneath somewhere. And they take a lever, a metal rod, which is about this long. They reach inside and they just press the dent out from the inside. It's an individual skill that's learned. There are different techniques to try to learn it, but the technicians generally just kind of learn the way that works best for them. And there's numerous places throughout the country that you can take training in it. And you can pay a small fee to go to training for like a 40-hour week-long training or extended training. And there's no trade secret about it. It's just a technique to remove dents. And some guys got the skill and some guys don't. And then another example of just how the agreement is not fair. It's a 20-page agreement where the signature is, but then there's a 32-page total that includes the appendix. And the appendix includes the definitions of many of the terms in the agreement. So it basically becomes like an insurance policy where somebody has to flip back, return from provision to provision. And it gets so confusing. An average layperson is not able to understand this complex process. But the restricted period on page 23 says, means the period of time extended from the effective date through the entire term of the agreement for a period of 24 months following the earlier termination of this agreement, which is April 2010, or termination of the managing partner's interest plus any period of time during which the manager has violated. So it's the earlier of those two dates. And that earlier two dates would be the date he ceased providing services to the partnership in April of 2010. So the restricted period begins to run from the date he left the partnership. And that's clear right there. It's a common interpretation of those words. And since you construe an agreement against the drafter, one must construe this agreement that the partnership was terminated in April of 2010. And that's when the two years began to run. Okay, thank you. You'll have an opportunity to rebut. Thank you, Your Honor. All right. You're welcome. Mr. Throckill. Yes, Your Honor. Can I just ask you a question? Yes, Your Honor. What date do you believe the breach occurred in this case? We believe that the initial breach took place when they discovered he was violating non-compete at Westfall Motors. So according to your complaint, it would be January 17th, 2012 in paragraph 8. If I'm reading that correctly, that's why I'm wondering.  So this performance of work at Westfall O'Dell Auto Dealership, which had been a client of your client, was the first breach. And then you allege continuing breaches? Yes, Your Honor. But in your complaint, your amended complaint I'm referring to, I don't see that. I don't see where you're alleging any dates. You know, the continuation. Well, Your Honor, we... Is this the only... I want to make sure I'm looking at the right pleading. But this is entitled Amended Complaint, filed October 7th, 2014. And I want to make sure that that's the operative complaint we're dealing with. That is the operative complaint, Your Honor. Okay, thank you. Now I'm going to let you go. Okay. You know, during discovery, we were obviously able to subpoena some records and take some depositions. And we were able to determine that Mr. Allen was continuing to violate the non-compete. The records from Westfall were subpoenaed showing that his company, Missing Page LLC, was being invoiced for painless dent repair. During his deposition, he talked about... Missing Page LLC was his company. He talked about the business of Missing Page LLC. Missing Page? Missing Page. I just want to make sure we get it for Justice Moore. That's why I'm asking. Unlike the earlier case where you had Missing Page, yes, the name of the LLC was Missing Page. And he testified that the business of Missing Page was painless dent repair. He testified about that in the trial on this matter. So the continuing violation was in evidence at the trial level. So I didn't really think that that was an issue. So that's how the court came up with its 24 months? Yes, Your Honor. Following the last violation? Correct. The permanent injunction would be enforced from the time period of the trial. Okay, but you didn't amend your pleading to conform to that proof that I know of. No, Your Honor. We did not file a motion to amend it. Okay. So the, I think there was some discussion about the complaint, pardon me, the contract. A direct contract was sent to the defendant, and he had to get a full copy of it for a month prior to signing the agreement. You know, he testified that that did occur, that he had that. You know, he had some very unusual testimony that he thought he might have been drunk for the entire month, and so maybe he didn't really understand it. It was very odd testimony at the trial. He, when asked about the, why he was continuing to violate the non-compete, you know, his testimony was that he thought it was okay because he didn't see his upline partners back in the territory trying to conduct business there. That was his testimony. He said, well, I didn't think I was violating it because I didn't see those guys there. So, you know, the evidence before the trial court was clear that this man was continuing to violate the non-compete clause. Okay, so in addition to violation, what is so secretive about this business? What is the trade secret, so to speak? Well, Your Honor, that issue did not really, was not really invited to trial. Mr. Binkley did come in and testify at trial, and he talked about the certification procedures that his company, Cosmetic Car Company, goes through in training people in painless dent repair. He talked about, you know, it's about a 10-week initial training where they bring them in on-site. They have, you know, they have trainers there to help explain these things, help train them up on performing the painless dent repair. And then he talked about the continuing training when they go back out into their territory and start trying to develop their own business, that their upline partners are there to go out on not only sales calls with them to help them try and develop their business, but to continue to assist them in perfecting the techniques and their capabilities and skill in removing dents. And he talked about, you know, a lot of people, Mr. Binkley's testimony at trial, he talked about a lot of people are able to fix small dents. He talked about the difference in their company being able to fix very large dents, make it look, appear as though the dents have never occurred. It sounds so, excuse me, Mr. Donovan, it sounds more like a vocational type of training that, you know, you can attend. You pay your money, you attend, and they explain how to take out the dent. I mean, is it really so special, like a formula for Coca-Cola? Is it that special to make it a trade secret? Well, the people at Cosmetic Car Company believe that it is, and they go to great efforts to protect their methodology and the procedures for doing that. What kind of efforts do they go to? What am I going to see in the record? They talk about the contract itself. It has confidentiality provisions in there. They talk about as part of the training when people are on site for learning how to do the painless dent repair, that they also talk to them there about the importance of confidentiality and protecting the trade secrets that they have in order to protect the business that they are entering into and the business that the trainers and the others are already in, trying to protect that aspect of the business. Do you agree that Missouri law only upholds these kinds of agreements if you can show that there is some kind of trade secret or secret customer list at issue? Do you agree with that proposition of law in Missouri? No, Your Honor. Okay. What is your understanding of Missouri law in that regard as to trade secrets or customer lists? Well, as far as the trade secrets, my understanding of Missouri law is that the contract that we have here is to be interpreted according to the intent of the parties and that the Missouri law, at least the Missouri law that I looked at, didn't touch on whether or not a trade secret was essential to upholding a non-compete agreement. Okay. So that's not a central issue in obtaining an injunction like this? No, Your Honor. In your view. Okay. I think we also, on the injunction part, we cited the Millfield v. Bishop case talking about the right of the parties to contract and also the Butler v. Mitchell case ascertaining the intent of the parties. Did you look at the property tax representative's case cited by the appellant? I believe that that was a see also citation and I don't recall that it added anything to the argument you made for the case he cited above that. Okay. Your Honor, I didn't see any case that the defendant cited that the contract was invalid for any reason. He talked about no extensions, but in those cases he cited, the courts were reversing trial courts for extending the injunction period outside the parameters of the contract that was at issue. And in this case, of course, the contract here talks about a two-year period and it's to be extended by contract for any period where the defendant is continuing to violate the contract. And so the issues that I saw raised in the defendant's brief and cases in the defendant's brief didn't apply to the contract that we're talking about today. So in your complaint, you allege that the first date of the violation is January 17, 2012. You filed this case almost two years later. I'm not that great at calculating. October 7, 2014. So February 2012 or over two years later. No, no, this was the admitted complaint. I'm sorry, Your Honor. I'm sorry. I don't have the original complaint, but it was a 12 case number, 2012. Right. So it was filed the same year of the initial breach. Yes, Your Honor. What was going on that we didn't get to the hearing until 2015? Were you all engaged in discovery or what took so long? I think we had a couple of case management orders that were entered in the case. And I don't recall the exact reasons, but I know both sides moved to continue them at various points. Okay. And so they would continue. Was a TRO ever issued? A TRO was not applied for. So despite the fact that you filed your complaint right away and you were worried about all these secrets, trade secrets, customer lists, you didn't seek a TRO to maintain the status quo? No, Your Honor, we did not seek a TRO. Okay. You know, I wanted to raise one thing that I heard on this argument from earlier, was the claim that Dan Binkley had breached the contract. And there was nothing in the record about Dan Binkley breaching the contract. Nothing was raised to the trial court that this was an issue that the trial court needed to consider. Okay. I was just arguing that that issue was not raised at that level and was waived. Was there a penalty fine actually imposed or was there a threat of one? Your Honor, what is our difference in the briefs? There were a number of these partnerships that have their own territory, and it came to the attention of Mr. Binkley and others at the Cosmetic Cart Company that this was going on. And they had a—he talked about they had a discussion in the upper management about how to deal with that issue. They called a meeting where they could talk about it in front of all partners. And Mr. Binkley, I think, testified that he thought it was—he couldn't remember what the fine amount was. It was either $17,000 or $20,000. And that the fine was going to be, number one, it was not going to be assessed against anybody. It was, as he said, something that they wanted to use to tell all the partners how important it was that they stay within their own territory, that the territories were set up in such a way that everybody was going to have enough business opportunities within those territories that the partnerships would all succeed. He testified that the fine, number one, was not going to be imposed on anybody. He also testified that the fine was going to be not $20,000 or $17,000 per person, but it was going to be a single fine, and it was going to be pro rata applied to everybody. He said that he thought that the defendant's amount of the fine here was going to be $200 or $300. So his—Mr. Krause's statement that his client constructively left wouldn't be correct because it was only if he continued poaching on the area he wasn't supposed to be in that it might be imposed. Is that— That's a correct statement. —the testimony was? That was the testimony. It was—they were just trying to figure out how to solve the problem they had with the partners being—going into the wrong territories. And so, like I said, they had a formal meeting among all the different partnerships to talk to them about how important it is that they stay within their own territory. And then they also talked about the fine, said it wasn't going to be imposed, and that even if it was, it was going to be pro rata based upon, I think, the amount of business we had done or something outside of their own territory. And like I said, he testified that Mr. Allen's was only going to be $200 or $300. Thank you, Your Honors. If you have any other questions. So why do you think he left? Why did he leave? Just by the testimony he gave, he appeared to be unhappy in the job. His—he had tried to apply for a window tinting business—not business, he had told one of his upline partners that he was going to get into the window tinting business also to, I guess, supplement his income in some way. And his partner said, you're in the painless dent repair business, you can't go into window tinting. And Mr. Allen said, well, you know, I paid $900 already to get into this window tinting class. And his upline partner said, well, you can't do it. And his upline partner gave him the $900 that he was out. And, you know, that's kind of my point here is it just seems to me like the window tinting business is something you can go pay for a class. Is the dent repair business something you can pay for as a class? I don't know. But the penalty, liquidated damages caused, regardless of what you call it in paragraph 16 or 6, I'm sorry, 6. This is quite an amount. I mean, it's two years of your income, your adjusted net income before interest and taxes. So I'm still wondering how the $224,000 was assessed by the court. How did that figure get arrived at? There was, during Mr. Binkley's testimony, he had an accounting statement from the partnership that was introduced into evidence that covered the 24-month to two-year period from when Mr. Allen left the partnership the two years prior to that. So the date he left the partnership was the 17th of 2012, January. Yes. Okay. So he had crafted some kind of accounting statement, and was that based upon Mr. Allen's net income as in this section of the paragraph? Yes. That came in without objection and was not rebutted in any fashion. And was there any evidence that indicated in any way that this money, the $224,000, was related to harm that was caused by the business, caused to the business? Well, that was a matter of testimony also. The first testimony that came in regarding the liquidated damages clause and why it was in there, Mr. Binkley talked about being in this business for a long time and dealing with this type of situation in the past. And the difficulties that they had encountered in trying to ascertain the damages that occur when somebody leaves and then violates their non-compete, keeps the customers and so forth. And he talked about this partnership territory being an area of, number one, of revenue generation. But he talked about when you have, say, car dealers, for instance, as a client, that they call you in if there's hail damage. You go in and you can do a lot of business on the lot fixing the hail damage. And he talked about that's not just the amount of damages you have because you lost that car dealer and looking at how much they may have done in the past couple of years. That car dealer is also a source of lead generation. He talked about having these types of people trusting you. And he said it takes, in his experience, it takes about two years before you get a whole lot of trust with people that they call you without hesitation to do this type of work. And he said, so once they trust you, they start finding other business for you. They'll have conversations with maybe other car dealers or other people. And they'll say, well, you know, I've got this car guy. He can come out and help you. So he talked. Okay. I hate to cut you off. That's all right. That's the one bad thing about this business. We have to cut you off. But thank you very much for your comments and the answers to our questions. Thank you very much. Is there a rebuttal? Yes, ma'am. Just to touch on that last point about the damages, you know, in discovery, they subpoenaed the invoices from one dealership and they got a list of the invoices. It's that easy to prove damages. If you have proof that there's a violation regarding painless death removal, you get invoices, you can prove your damages. And they got invoices from one dealership. You know, the other part that he was talking about as far as if you have a level of trust and they refer you to business, you know, that may or may not be true. But you don't have really a reasonable expectation of income from just, you know, vague referrals that come in. Was there any evidence for the court that this partnership alleged your client had interfered with 32 separate businesses? Was there any evidence in the trial court on that? No. Okay. And was there any evidence for the court that indicated more than just the one customer whose records had been subpoenaed? I don't believe so. And so when we look at the receipts for this one business, there will be three, I think it was, three? How many receipts for business? For the subpoenaed records? Yes. I think they had, you know, maybe three pages of, you know, itemized dollars. Itemized dollars. But it doesn't state what services were rendered. And my client was doing windshields at that time, and that's what he testified as to what those were. So not necessarily all those charges were related to dent repair. Right. And the record's going to reveal that. Yes. Okay. You can proceed if you have anything else. All right. And just as far as delay getting to trial, you know, they filed two years after he left and didn't get to trial for another three and a half years. I never requested any continuances of the trial setting until the one that actually was denied and went to trial, and that's why I was very surprised that I didn't at least get one continuance when I had surgery. So you never filed for continuance? Not for a trial setting. Okay. Did the other parties? They weren't prosecuting the case. It was just sitting there. So for two years, they were just going for liquidated damages. And then they came back and decided, well, let's go for an injunction also. You know, they never asked for a TRO, never filed anything for that. So, you know, they slumbered on their rights. What did you say? They slumbered on their rights? Yeah. Didn't you learn that in law school? I think that's where I think I got it from. I'm much older than you, so I didn't. But, you know, latches, the latches argument that they delayed. And, you know, if they were having damages, they could have at any time sought a TRO. But apparently, you know, they decided not to. They didn't think it was worth it. And, you know, they didn't have anybody in the area that could even do this. So they can't prove that they had any damage. Even if my client has done what they alleged, they can't prove that they had anybody to go in and do the damage or that was, you know, in the area to service the customers. So they can't prove their damages. So the fines being assessed, you know, my client was under the impression that he wouldn't continue the company and he was going to have to pay a $20,000 fine. He quit. If they were saying, oh, well, you know, your upline partners are going to pay your fine for you, he wouldn't quit. He would have stayed there. Although he did have other things. He had pounds with him. But that was the straw that broke the camel's back when they said you got to pay $20,000. That's all, Your Honor. I just ask that the court reverse the judgment of the trial court. And thank you very much. Thank you both, counsel, for your comments and remarks today. This matter will be taken under advisement and we will issue a disposition in due course. Thank you both. Have a good evening. Safe travels.